**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**COOKEVILLE DIVISION**

| | | |
|---|---|---|
| **RAYMOND DOUGLAS MYERS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:11-cv-00045** |
| | ) | **Chief Judge Sharp** |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**To: The Honorable Kevin H. Sharp, Chief United States District Judge**

## REPORT AND RECOMMENDATION

For the reasons explained below, the undersigned **RECOMMENDS** that the petition for writ of *habeas corpus* (Docket No. 1) be **DENIED**, and that this action be **DISMISSED** with prejudice. The undersigned further **RECOMMENDS** that a certificate of appealability only issue as to the questions of whether Myers was effectively abandoned by his post-conviction attorneys in order to establish cause under *Maples* for his procedurally defaulted ineffective assistance of counsel claims and as to whether *Martinez* should be interpreted to apply to the facts of the petitioner's case as it pertains to Claims 8-20.

## I.    INTRODUCTION AND BACKGROUND

The petitioner, Raymond Douglas Myers,[1] has filed a *pro se* petition for a writ of *habeas corpus* under 28 U.S.C. § 2254.  (Docket No. 1).  The petitioner is an inmate at the Morgan County

---

[1]  Throughout this memorandum, Raymond Douglas Myers is referred to as "petitioner," "defendant," and "appellant" interchangeably.

1

Correctional Complex in Wartburg, Tennessee. The petitioner challenges the legality of his confinement under a 2002 judgment of the Criminal Court for Putnam County, Tennessee, convicting him of three counts of first degree murder, two counts of felony murder, one count of aggravated arson, and one count of conspiracy to commit murder in connection with the deaths of Dianne Watts, her daughter Jessica Watts, and Jessica's friend, Chelsea Smith.[2] (Docket No. 38-7).[3] The trial court sentenced the defendant to consecutive life sentences without the possibility of parole for the first degree murder convictions and to a consecutive 24-year sentence for the aggravated arson conviction. (Docket No. 38-8).

On direct appeal of his convictions and sentence, Myers raised the following claims: (1) that the evidence is insufficient to support his convictions; (2) that Tennessee's first degree murder sentencing statute is unconstitutional; and (3) that the trial judge improperly instructed the jury regarding the State's burden of proof. (Docket No. 21-3). On April 29, 2004, the Tennessee Court of Criminal Appeals affirmed the petitioner's convictions and sentence. (Docket No. 21-5). Thereafter, Myers filed an application for permission to appeal with the Tennessee Supreme Court raising the following issues: (1) whether the evidence is sufficient to support the verdict and (2) whether the jury charge on circumstantial evidence effectively reduced the burden of proof of the State. (Docket No. 21-6). On November 8, 2004, the Tennessee Supreme Court denied petitioner's application for permission to appeal. (Docket No. 21-7).

---

[2] The petitioner's convictions for felony murder and the conspiracy to commit murder conviction were subsequently merged by the trial court with the three convictions for first degree murder. *State v. Myers*, 2004 WL 911280, at *5 n.1 (Tenn. Ct. Crim. App. Apr. 29, 2004).

[3] For ease of reference, the page numbers cited herein refer to the "PAGE ID" numbers of the technical record filed by the respondent, which are the right-most numbers on the line of text imprinted on documents by the court's docketing system. (Docket Nos. 21 and 38 & Attachs.).

On July 25, 2005, Myers filed a *pro se* petition for post-conviction relief in the Putnam County Criminal Court. (Docket No. 21-8 at p. 282). Myers filed *pro se* amendments to the petition for post-conviction relief on March 25, 2008, and March 6, 2009. (Docket No. 21-8 at p. 316; Docket No. 21-9 at p. 440). Following an evidentiary hearing held August 14, 2009, the post-conviction court denied relief. (Docket No. 21-10 at p. 598).

Myers appealed. (Docket No. 21-13 at p. 806). On appeal to the Tennessee Court of Criminal Appeals, he claimed that he received ineffective assistance of counsel, contending that trial counsel's performance was deficient because he failed to adequately prepare and investigate and because he failed to call witnesses beneficial to petitioner's case, specifically Dan McInnis, Terry Coppinger, and Jimmy Bonner. (*Id.*) Myers further asserted as grounds for ineffective assistance of counsel that trial counsel was generally incompetent. (*Id.*) On August 23, 2010, the Court of Criminal Appeals affirmed the denial of post-conviction relief. (Docket No. 21-15 at p. 854).

In his application for a Rule 11 appeal to the Tennessee Supreme Court, Myers challenged the following: (1) the lower courts' findings that Myers failed to establish ineffective assistance of counsel based upon trial counsel's failure to call Jimmy Bonner as a witness; (2) the lower courts' findings that the testimony of Frost, Shepard, Borlund, Isbell, and Myers did not establish that trial counsel failed to present all defenses or was incompetent; (3) the lower courts' findings that Myers failed to establish ineffective assistance of counsel based upon trial counsel's failure to fully investigate the case and call Terry Coppinger and Dan McInnis as witnesses; and (4) whether Myers established ineffective assistance of counsel based upon trial counsel's failure to call or properly cross-examine Spangler, Humphrey, McCormick, and Raymond. (Docket No. 21-16). The Tennessee Supreme Court denied permission to appeal on January 13, 2011. (Docket No. 21-17).

On April 15, 2011, Myers timely filed the instant *pro se* petition for writ of *habeas corpus*. (Docket No. 1). In his petition, Myers asserts twenty-one (21) grounds for relief. He names the State of Tennessee as the respondent.

Upon its receipt, the court conducted a preliminary examination of the petition and determined that the petitioner had stated a colorable claim for relief. Accordingly, the court entered an order on April 28, 2011, directing the respondent to answer or otherwise respond to the petition, the time for which was subsequently extended by the court. (Docket No. 6). The respondent filed an answer in which it urged the court to deny the petition and dismiss the action. (Docket No. 20). The petitioner filed a reply to the answer. (Docket No. 31).

On April 25, 2012, the petitioner filed a *pro se* motion seeking permission to brief the issue of procedural default and cause for excusing the default in light of the United States Supreme Court's March 2012 decision in *Martinez v. Ryan,* 566 U.S. ___, 132 S. Ct. 1309 (2012). (Docket No. 39). The court granted the motion (Docket No. 40), and the petitioner, having secured counsel, filed his brief on July 6, 2012. (Docket No. 45). The petitioner's counsel filed a supplemental brief on May 8, 2013. (Docket No. 51).

Although the court's order permitted the respondent to respond to the petitioner's post-*Martinez* brief (Docket No. 40), no response was filed. By order entered on October 2, 2015, the court order the respondent to respond to the petitioner's post-*Martinez* brief, specifically addressing the issue of procedural default with regards to Claims 8-11 and 12-20. (Docket No. 55). The respondent filed its brief on December 15, 2015. (Docket No. 60). The petitioner filed a response to the brief. (Docket No. 63).

Upon consideration of the record, the court concludes that an evidentiary hearing is not needed. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003)(an evidentiary hearing is not required when the record conclusively shows that the petitioner is not entitled to relief). Therefore, the court shall dispose of the petition as the law and justice requires. Rule 8(a), Rules — § 2254 Cases.

Jurisdiction and venue in this court are appropriate under 28 U.S.C. § 2241(d) because the petitioner was convicted in the Criminal Court of Putnam County, Tennessee.

## II.    SUMMARY OF THE EVIDENCE

### A.    Trial

The following summary of the facts of the case is taken from the opinion of the Tennessee Court of Criminal Appeals in *State of Tennessee v. Raymond Douglas Myers,* 2004 WL 911280, at ** 1-2 (Tenn. Ct. Crim. App. Apr. 29, 2004):[4]

> On July 30, 1999, the McMinnville Fire Department responded to a house fire. Inside the house, firefighters discovered the bodies of Dianne Watts, her daughter Jessica Watts, and Chelsea Smith, Jessica Watts' friend who spent the night with her on July 29. Dianne Watts, her daughter Jessica, and Dianne Watts' boyfriend, the Defendant, lived together in the house that burned. The Defendant had lived there about six years. Investigators with the fire department determined that the fire was deliberately set with an "ignitable liquid fuel" based upon burn patterns and the presence of an accelerant in the bedrooms, in the hallway, on the bed, and on the clothes of Chelsea Smith and Jessica Watts. Firemen also recovered a metal baseball bat from the hallway and a torque wrench from the area immediately at the front door of the house.

---

[4] The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1).("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). The petitioner here does not contest the appellate court's statement of facts.

Dr. Bruce Levy, who performed the autopsies on the victims' bodies, testified that he identified five injuries to Chelsea Smith's head and one to her groin. She died as a result of the blunt-force injuries and smoke inhalation. Dr. Levy testified that the injuries to Ms. Smith were consistent with full-swing blows from the torque wrench. The evidence of smoke inhalation indicates that Ms. Smith was alive when the fire was set.

Dr. Levy also testified that he found two injuries on Jessica Watts' head that he believed to have been caused by blows from the torque wrench. The immediate cause for Ms. Watts' death was smoke inhalation.

With respect to Dianne Watts, Dr. Levy found two severe injuries to her head that he believed were caused by the baseball bat. Raymond DePriest, a forensic scientist with the Tennessee Bureau of Investigation, testified that a DNA analysis of blood from the baseball bat showed the blood to belong to Dianne Watts.

Four persons were indicted for the murders, arson, and conspiracy to commit the murder of Diane Watts: the Defendant, the Defendant's friend Johnny Lee Lewis, the Defendant's mother Clementine Myers, and the Defendant's brother Gary Myers. The State's theory was that the four of them conspired to kill Dianne Watts because she had information regarding criminal activity in which they engaged. Gary Myers' house had been burglarized, and he and Clementine Myers believed that Ms. Watts was responsible. Gary Myers had been investigated for bankruptcy fraud and food stamp fraud, and the conspirators thought Ms. Watts had information related to the investigation for fraud.

The State offered the testimony of the Defendant's estranged wife, who heard him and Johnny Lewis talking about how Ms. Watts was "running her mouth," and that Clementine Myers wanted Ms. Watts to "shut up." The day before the murder, Mr. Lewis bought approximately five two-gallon jugs of gasoline. Shortly after the murders, the Defendant gave Mr. Lewis nine hundred dollars that came from Clementine Myers. On the morning following the murders, Gary Myers called the Defendant at approximately 6:20 a.m. and tape recorded a brief portion of their conversation, which the State characterized as an attempt to create an alibi for the Defendant.

Throughout the trial, the prosecution offered the testimony of

> witnesses who had heard the Defendant, Johnny Lewis, and
> Clementine Myers make incriminating statements and threats
> regarding Ms. Watts. Several witnesses testified to details of the
> burglary of Gary Myers' house and the exchange of a stolen tractor
> for methamphetamine by the Defendant and Mr. Lewis.

(*Id.*)


**B.    Post-Conviction**

The Tennessee Court of Criminal Appeals summarized the evidence presented at the post-

conviction hearing in its opinion affirming the trial court's denial of post-conviction relief, as

follows:

> The post-conviction court eventually held a hearing on the petition for
> post-conviction relief. At the hearing, Petitioner presented several
> witnesses. Dan McInnis testified that he was not called as a witness
> at trial. According to Mr. McInnis, his testimony would not have been
> helpful for the defense or the prosecution. Mr. McInnis stated that, if
> called to testify at trial, he would have informed the jury that on July
> 30, 1999, he went to work between 7:30 and 8:30 a.m. When he
> unlocked his shop door, he saw Petitioner coming around the corner.
> Mr. McInnis waved at Petitioner, and Petitioner waved back.
> Petitioner was walking in the direction of the grocery store in Viola.
> Mr. McInnis also saw Petitioner driving a little car.  Mr. McInnis
> testified that Petitioner normally drove a pickup truck that had a loud,
> distinct sound. On cross-examination, Mr. McInnis could not say for
> certain what day he saw Petitioner.

> Terry Coppinger testified to the post-conviction court that he lived
> two houses away from Petitioner's mother.  Mr. Coppinger saw
> Petitioner's truck parked in Petitioner's mother's driveway the week
> of the murders.

> The truck was sitting in the yard between his mother's house and the
> neighbor's house and had been sitting there for several days. Mr.
> Coppinger confirmed that Petitioner's truck had a loud, distinct
> sound. Mr. Coppinger did not remember hearing the truck that week.
> Mr. Coppinger typically left for work between 6:00 and 6:15 a.m. On

the morning of the murders, Mr. Coppinger took another way to work and did not see if Petitioner's truck was in the driveway at Petitioner's mother's house.

Jim Bonner lived directly across the street from Petitioner's mother's house. Mr. Bonner testified that he too saw Petitioner's truck parked outside the house the week of the murders. In fact, he heard Petitioner complain that the truck was broken. Mr. Bonner recalled that the truck stayed at the house from Tuesday to Saturday, the day of the murders. Mr. Bonner recalled the distinct sound made by Petitioner's truck and testified that if it were started in the middle of the night, he would have heard it.

Mr. Bonner testified at the post-conviction hearing that he saw Petitioner's truck on the morning of the murders. It was parked at Petitioner's mother's house. Petitioner's mother, Clementine Myers, called Mr. Bonner that morning around 7:45 a.m. to tell him that "Diane and them [sic] kids got burnt up." Petitioner's truck was still parked at the house. When Mr. Bonner got to Ms. Myers's house, Petitioner's brother Gary was there but Petitioner was not. Mr. Bonner tried to go to the scene of the crime but was stopped by authorities. When he got back to his house, Gary Myers was gone and Petitioner was at his mother's house.

Mr. Bonner admitted on cross-examination that he had given two statements to authorities. Mr. Bonner did not mention seeing Petitioner's truck in either statement. Further, he admitted that he did not tell anyone that the truck had been there for several days without being moved. Mr. Bonner insisted that after he signed the statements he called a police officer and told him about the truck.

Charles Frost acted as the mitigation specialist on the defense team. When the case first started, Petitioner was potentially facing the death penalty. Mr. Frost has a degree in social welfare. Mr. Frost visited with Petitioner several times during his service on the case. He gathered information about Petitioner's social history and visited a number of Petitioner's family members in preparation for the case.

Mr. Frost spoke with trial counsel on a number of different occasions. Mr. Frost expressed concern over the fact that the evidence pointed to a fairly solid alibi defense by Petitioner. Mr. Frost did not think that trial counsel was able to put together a defense. Mr. Frost described trial counsel as confused, incoherent, and forgetful.

8

In examining the case, Mr. Frost felt that it was important to have a jury that was less emotional. Mr. Frost did not think that trial counsel appreciated the seriousness of jury selection. Mr. Frost testified that trial counsel sometimes lost track of himself, both prior to and during the trial. Mr. Frost did not think that trial counsel was mentally stable enough to effectively represent Petitioner at trial.

On cross-examination, Mr. Frost admitted that this was the only capital case he had ever worked on in his career. He acknowledged that trial counsel was able to put together a solid defense surrounding an alibi. Further, Mr. Frost admitted that he never expressed any concern about trial counsel's ability to the trial court.

Neca Shepard was next to testify at the post-conviction hearing. Ms. Shepard worked with Tom Isbell as a private investigator on Petitioner's case. Ms. Shepard had limited communication with trial counsel. She recalled two instances that she interacted with trial counsel. On one occasion, trial counsel seemed forgetful and easily confused. Ms. Shepard described trial counsel's car as full of documents. Ms. Shepard felt that there was a lot of material that was uncovered during the investigation that should have been used at trial but was unable to articulate the substance of this material to the post-conviction court. On cross-examination, Ms. Shepard admitted that Petitioner's trial was the first capital case she had ever worked on during her career.

Thomas Borlund, Jr., an assistant to the one of the investigators in Petitioner's case, testified at the hearing. Mr. Borlund was responsible for compiling information on nearly 400 potential witnesses in Petitioner's case. Mr. Borlund was of the opinion that trial counsel should have called more witnesses at trial. He agreed that it was ultimately trial counsel's decision and admitted that he had never worked on a capital case before.

Thomas Isbell, a private investigator, worked closely with trial counsel on Petitioner's case. He was responsible for interviewing numerous witnesses. Mr. Isbell felt that trial counsel did not use the majority of the information that he secured prior to trial. Mr. Isbell recalled a meeting on the day prior to trial during which he gave trial counsel a list of forty witnesses that were essential to the trial. Trial counsel repeatedly informed Mr. Isbell that he was relying on an alibi defense. Mr. Isbell expressed concern that trial counsel was hanging his hat on one defense rather than a total defense.

Mr. Isbell was under the impression that trial counsel was ineffective due to his limited attention span, forgetfulness, and due to the fact that he was easily confused. Mr. Isbell informed trial counsel that Petitioner had a hernia surgery two weeks prior to the murders. Mr. Isbell interviewed Petitioner's doctor in preparation for trial and was disappointed that trial counsel did not use this information. Additionally, Mr. Isbell felt that trial counsel did a poor job of cross-examining the State's witnesses.

Mr. Isbell admitted that this was his first exposure to a capital case. He acknowledged that trial counsel's strategy from the beginning of the investigation was to focus on an alibi defense. Mr. Isbell admitted that he was not qualified to judge trial counsel's effectiveness because he is not an attorney. Further, Mr. Isbell did not express his concern about trial counsel's effectiveness to the trial court.

Petitioner took the stand at the hearing. According to Petitioner, trial counsel was not easy to communicate with about the trial. Petitioner stated that trial counsel would not listen to him, and Petitioner could not "connect" with trial counsel. Petitioner stated that trial counsel would not "listen" to what he had to say about the case. Petitioner stated that the defense was that of an alibi. Petitioner felt that trial counsel was often "confused." However, Petitioner stated that trial counsel "done [sic] pretty good starting off at the trial." As the trial progressed, Petitioner stated that trial counsel "wasn't putting on the proof or doing nothing [sic]."

Trial counsel testified at the hearing that he had been licensed to practice law since March of 1962. Trial counsel had been involved in several capital cases prior to representing Petitioner. Trial counsel testified that he had experienced significant health problems since Petitioner's trial but did not "believe" that he had any health problems during the trial. Trial counsel described the trial as "complex" and that early on he decided to base his strategy on the fact that Petitioner had an alibi. Trial counsel felt that the State did not "have enough proof to convict" Petitioner at trial. Trial counsel recalled meeting with the other attorney on the case "numerous" times prior to trial. Trial counsel could not give a "specific number" of times that he met with Petitioner prior to trial.

Trial counsel testified that he did everything in his power to secure a not guilty verdict. Trial counsel was surprised by the guilty verdict

because he did not think that there was sufficient evidence to convict Petitioner.

At the conclusion of the hearing, the post-conviction court determined that the investigation into Petitioner's case "was very thorough" and that the record indicated that "all that the petitioner asked for prior to trial was given to him." The post-conviction court commented specifically on the high volume of pro bono work that was done for Petitioner prior to trial.

The post-conviction court also determined that trial counsel was not ineffective for failing to call witnesses because the alibi defense was a "great defense" that "generally stands on its own." Further, the post-conviction court found that Petitioner was given a full defense in that trial counsel presented an alibi defense, argued that the evidence was not sufficient, and questioned the motive presented by the State for committing the murders. The post-conviction court did not hear any testimony at the hearing that would have changed the outcome of the case and did not hear of any additional defenses that could have been presented.

The post-conviction court determined that there was no testimony presented about any constitutional violations dealing with the jury. Further, the post-conviction court determined that trial counsel was not incompetent at Petitioner's trial. The post-conviction court commented that the circumstantial evidence was "very strong" and that "there is nothing . . . to show that [trial counsel] was anything other than an effective trial counsel at the time [of trial]."

The post-conviction court did not find any "competent" evidence of prosecutorial misconduct that occurred at trial. Further, the post-conviction court did not find that there were any "civil rights violations of witnesses."

*Myers v. State,* 2010 WL 3323748, at **2-6 (Tenn. Ct. Crim. App. Aug. 23, 2010).

## III.    STANDARD OF REVIEW

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism."

*Woodford v. Garceau*, 538 U.S. 202, 206, 123 S. Ct. 1398, 155 L.Ed.2d 363 (2003) (internal

citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes

a foundational principle of our federal system: State courts are adequate forums for the vindication

of federal rights." *Burt v. Titlow*, 571 U.S. ___, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013). The

AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims

have been adjudicated in state court." *Id.*

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs

of *habeas corpus* is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ

of *habeas corpus* on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct, and those findings can be

contravened only if the petitioner can show by clear and convincing evidence that the state court's

factual findings were erroneous. 28 U.S.C. § 2254(e)(1). The petitioner is entitled to an evidentiary

hearing if he alleges sufficient grounds for issuance of the writ, relevant facts are in dispute, and the

state courts did not hold a full and fair evidentiary hearing. *Sawyer v. Hofbauer*, 299 F.3d 605, 610

(6th Cir. 2002). As the Supreme Court has advised, "[t]he question under AEDPA is not whether

a federal court believes the state court's determination was incorrect but whether that determination

was unreasonable–a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127

S. Ct. 1933, 167 L.Ed.2d 836, (2007) (citing *Williams*, 529 U.S. at 410). The Supreme Court has held that review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 131 S. Ct. 1388, 1398, 179 L.Ed.2d 557 (2011).

Further, "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted). Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002).

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Alley,* 307 F.3d at 386. A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Second, constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective-assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id.* If

the ineffective-assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective-assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53, 120 S. Ct. 1587, 146 L.Ed.2d 518 (2000).

Until recently, a prisoner could not demonstrate cause for default by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 752–53, 111 S. Ct. 2546, 115 L.Ed.2d 640 (1992) (holding that attorney error is not cause to excuse a default). The holding in *Coleman* was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." *Id.* (internal quotations omitted).

*Martinez v. Ryan* created a new basis for establishing "cause" to excuse a procedural default. 132 S. Ct 1309 (2012). *Martinez* carved out "a narrow exception" to *Coleman's* general rule by holding that "ineffective assistance of counsel at initial-review collateral proceedings" could establish "cause" to excuse a prisoner's procedural default. 132 S. Ct. at 1315. *See Trevino v. Thaler*, 569 U.S. ___, 133 S. Ct. 1911, 1921 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective-assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). However, the *Martinez* exception does not "concern attorney errors in other kinds of proceedings, including appeals from initial review collateral proceedings." *Id.* at 1320.

The Supreme Court's creation in *Martinez* of a narrow exception to the procedural-default bar stemmed from its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 132 S. Ct. at 1318. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id.* at 1318–19, 1320. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*, 501 U.S. at 750.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause-and-prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court has also recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392, 124 S. Ct. 1847, 158 L.Ed.2d 659 (2004) (citing *Murray*, 477 U.S. at 496).

## IV.    CLAIMS OF THE PETITION

In his petition for writ of *habeas corpus*, Myers asserts the following the following grounds for relief:

1.  Whether the evidence was sufficient to support the petitioner's convictions.

2.  Whether the petitioner was denied his 5th, 6th, and 14th Amendment rights because of the trial court's erroneous charge to the jury which allegedly failed to require that the state prove all elements of the petitioner's offenses beyond a reasonable doubt.

3.  Whether the petitioner was denied effective assistance of counsel when counsel failed to call Jimmy Bonner as a witness at trial.

4.  Whether the petitioner was denied effective assistance of counsel based upon trial counsel's mental incompetence.

5.  Whether the petitioner was denied effective assistance of counsel by trial counsel's alleged failure to investigate the petitioner's case.

6.  Whether the petitioner was denied effective assistance of counsel when trial counsel failed to call Terry Coppinger as a witness at trial.

7.  Whether the petitioner was denied effective assistance of counsel when trial counsel failed to call Dan McInnis as a witness at trial.

8.  Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to call or properly cross-examine Robert Spangler.

9.  Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to call or properly cross-examine Shirley Humphrey.

10. Whether the petitioner was denied effective assistance of counsel based upon trial

counsel's failure to call or properly cross-examine Shawn McCormick.

11. Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to call or properly cross-examine Raymond Hicks Myers, Jr.

12. Whether the petitioner's rights to due process, a fair trial, and a direct appeal under the 14th Amendment were violated by the state's alleged suppression of exculpatory evidence regarding Robert Spangler.

13. Whether the petitioner's rights were violated by the state's alleged suppression of exculpatory evidence obtained from the residence of Dianne Watts, including a caller ID box and numerous recorded telephone calls.

14. Whether the petitioner's rights were violated by the state's alleged suppression of exculpatory evidence relating to Shirley Humphrey's telephone records.

15. Whether the petitioner's rights were violated by the state's alleged suppression of exculpatory evidence that Dianne Watts called Mike Brady and John Lewis at Humphrey's residence hours before the homicides.

16. Whether the petitioner's rights were violated by the state's alleged suppression of exculpatory evidence that Jimmy Bonner had informed officials that petitioner's truck had been at the petitioner's mother's home at the time of the homicides.

17. Whether the petitioner's rights were violated by the state's alleged suppression of exculpatory evidence John Lewis had been at the victim's residence at the time of the murders and that the petitioner was not there.

18. Whether the petitioner's rights under the 14th Amendment were violated by the state's alleged suppression of exculpatory evidence concerning a private fire consultant, Stuart Bain.

19.  Whether the petitioner's rights under the 14th Amendment were violated by the state's alleged suppression of exculpatory evidence consisting of the names of Mark Petty and "other individuals," who had been considered suspects in the case.

20.  Whether the petitioner's rights under the 14th Amendment were violated by the state's alleged suppression of exculpatory evidence obtained from Shirley Humphrey that Toby Young, Tim Meirs, Mike Brady, and others had committed the offenses.

21.  The petitioner is actually innocent of the crimes for which he was convicted.

(Docket No. 1 at pp. 5-24).

## V.     ANALYSIS

### A.      Insufficiency of the Evidence (Claim 1)

#### 1.    Exhaustion

The respondent concedes that the petitioner has exhausted this claim.  (Docket No. 20 at p. 18).

#### 2.    Merits

Myers first claims that the evidence presented at trial was insufficient to support his convictions of the murders of Dianne Watts, Jessica Watts, and Chelsea Smith and his conviction for aggravated arson. Myers raised this claim on direct appeal to the Tennessee Court of Criminal Appeals, essentially arguing that the state's evidence was entirely circumstantial and that his witnesses supported his version of the events.  (Docket No. 21-3).

The Tennessee Court of Criminal Appeals considered the petitioner's sufficiency of evidence claim in its opinion.  (Docket No. 21-5).  Therefore, this court must presume the correctness of the state court's factual determinations.  28 U.S.C. § 2254(e)(1).  The petitioner may rebut this

presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

On sufficiency of the evidence challenges, *habeas* relief is warranted "only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)(internal quotation omitted); *see also Jackson v. Virgina*, 443 U.S. 307, 319 (1979)("after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt")(emphasis in original).

In considering the petitioner's insufficiency of evidence claim in its opinion, the Tennessee Court of Criminal Appeals began by setting forth the correct legal standard:

> This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).
>
> On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the

trier of fact. *See Evans*, 108 S.W.3d at 236-37; *Carruthers*, 35 S.W.3d at 557.

*Myers*, 2004 WL 911280, at *2. The appellate court then considered the definition of the crimes under state law and the evidence supporting the premeditated and intentional nature of the crimes:

> Our criminal code defines first degree murder as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Given the testimony concerning the injuries to the victims and the cause of the fire, the evidence clearly supports a finding that the killings were premeditated and intentional. Aggravated arson is the knowing damage of a structure by fire for an unlawful purpose where there is a person present in the structure. *See* Tenn. Code Ann. § 39-14-301(a)(2), -302(a)(1). The evidence reflects that the fire was intentionally set with the use of accelerants. Dr. Levy testified that two of the victims were alive at the time the fire was set. Therefore, the proof is sufficient to support a finding that aggravated arson was committed. The question that remains is whether the evidence demonstrated beyond a reasonable doubt that the Defendant committed the offense.

*Id.* at *3. Next, the court outlined the evidence submitted by the state as to the identity of the perpetrator of the crimes against Watts, her daughter, and her daughter's friend:

> To connect the Defendant to the murders and the arson, the State first called Brandy Hodges, who lived near the house in which the victims died, which was rented by Dianne Watts. Ms. Hodges testified that she got home at approximately 6:00 on the evening of July 29. At around 11:00 that night, she saw Dianne Watts' vehicle drive into the driveway. Thereafter at about 1:00 a.m., she heard the Defendant's truck drive into the driveway of Ms. Watts' house. She said that she knew it was the Defendant's truck because it had "an extremely loud engine exhaust" on it, and she "had become pretty used to hearing it." Also, she never heard her dog bark, and her dog always barked when unfamiliar people were near. On cross-examination, she admitted that she did not see the Defendant's truck or the Defendant that night. She also admitted that she had heard other loud trucks that sounded similar to the Defendant's.
>
> Shawn McCormick testified that he helped the Defendant work on a

vehicle about two weeks prior to the murders. They were using Mr. McCormick's tools, including a cracked torque wrench. Mr. McCormick left the torque wrench in the basement of the house where the Defendant lived with Ms. Watts. Mr. McCormick returned some time prior to the murders to retrieve his tool box, but he discovered that his torque wrench was missing. Several people, including Ms. Watts' daughter, her brother, her nephew, and her sister, testified that they had been in her house shortly before the murders, but had not seen a torque wrench.

The State also offered the testimony of several witnesses who had heard the Defendant threaten to harm Ms. Watts. Minnie McReynolds testified that the Defendant had been at her house putting up molding a week or two before the murders. She said that Ms. Watts arrived and asked the Defendant when he would be home, and the Defendant stated that he was not going to go home with her. Ms. McReynolds testified that after Ms. Watts left, she heard the Defendant say, "One of these days I'm going to kill that bitch." When Ms. Reynolds asked him why he was so upset, he told her about a court date he had coming up.

Shonda Myers, the Defendant's daughter, testified that the Defendant treated Ms. Watts "like a dog." She also said that she had heard the Defendant threaten to kill Ms. Watts, but she did not believe that he meant it. She told investigators that, about two weeks before the murders, she heard the Defendant say that "if people kept on messing with him, he'd burn them out."

Diana Ross, who cut the hair of both the Defendant and Ms. Watts, testified that three or four weeks before the murders, the Defendant told her that "he was going to burn her house down with her in it." Ms. Ross said that the Defendant was upset because his son Raymond was living with Ms. Watts at the time.

The Defendant's estranged wife, Shirley Humphrey, testified that she heard the Defendant and Mr. Lewis talking about how Ms. Watts was "running her mouth," "pissing a lot of people off," and needed to be "shut up." On one occasion, she was present while Mr. Lewis was on the phone, and he told her he was talking to the Defendant. She heard Mr. Lewis tell the Defendant to "make sure the little girl isn't there."

Dan Ogle, an agent with the Tennessee Bureau of Investigation, interviewed the Defendant as part of his investigation of the murders.

He testified that he met the Defendant outside the police station. He noticed that, while still in the parking lot, the Defendant removed his belt and placed it inside his truck. This truck was later searched by a police dog trained to pick up the scent of accelerants. The dog focused intently on the belt that it found in the Defendant's truck. Later testing in a laboratory did not indicate the presence of an accelerant on the Defendant's belt. However, Randall Nelson, the TBI laboratory technician, testified that it was possible that the belt contained such a low level of the accelerant that his instruments failed to pick it up, or it may have evaporated.

More importantly, Agent Ogle testified that he asked the Defendant whether he had any tools at the house where he lived with Ms. Watts. The Defendant replied:

Shawn McCormick brought tools to the house and fixed the rear-end of my four-wheel-drive. Shawn McCormick left a torque wrench at my house approximately one or two months before this fire. Dianne brought this wrench from the basement to the livingroom and put it next to the front door by the curtain vent. If you entered the front door, this tool would be on your right. The color of the tool was silver. Shawn used the wrench, but I never did use it.

Agent Ogle testified that he did not mention the torque wrench to the Defendant, and no one outside of law enforcement knew its significance as one of the murder weapons. He further stated that the Defendant described the exact location where the investigators found the torque wrench. However, according to his statement, the Defendant had not been in Ms. Watts' house since the Wednesday before the murders, July 28, 1999. In his statement, the Defendant also denied ever threatening to kill Ms. Watts or "burn her out." Agent Ogle interviewed the Defendant on the day the bodies were discovered. He said the Defendant showed no emotion regarding the deaths of Ms. Watts and her daughter, Jessica.

*Id.* at **3-4. The court also considered the testimony of the defendant's alibi witnesses, ultimately concluding that, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt:

The Defendant presented two alibi witnesses, Teresa Myers (his ex-wife), and her mother, Clara Whipple. They both testified that the Defendant stayed at their house in Winchester on July 29, 1999. Ms. Whipple testified that she awoke the Defendant at 6:00 or 6:30 on the morning of July 30.

Viewing the totality of this evidence in the light most favorable to the State, we conclude that the evidence is legally sufficient to support the findings of guilt beyond a reasonable doubt. Shortly before the murders, the Defendant threatened to harm Ms. Watts, even saying "he was going to burn her house down with her in it." Shirley Humphrey heard Johnny Lewis tell the Defendant to "make sure the little girl isn't there." At around 1:00 on the morning of the murders, Brandy Hodges heard the Defendant's truck enter the driveway of Ms. Watts' house. She said that she recognized the Defendant's truck because it had "an extremely loud engine exhaust" on it, and she "had become pretty used to hearing it." Finally, Agent Ogle testified that, when he asked the Defendant about tools, the Defendant mentioned the torque wrench and described exactly where investigators located it at the crime scene. However, several witnesses, including Ms. Watts' daughter, who had been in the house the day before the murders, testified that there was no torque wrench in the living room at that time. Although the Defendant offered two witnesses who testified that he was in Winchester at the time of the murders, the jury obviously discredited the testimony of these witnesses and found the Defendant guilty. While not overwhelming, the proof is sufficient to support the convictions.

*Id.* at *5.

"On a state prisoner's habeas petition challenging the insufficiency of the evidence," such as in the instant case, the court "must draw all available inferences and resolve all credibility issues in favor of the jury's verdict." *Rodriguez v. Trombley,* No. 2:06-cv-11795 , 2010 WL 120222, at *14 (E.D. Mich. Jan. 8, 2010). Because "[a]ttacks on witness credibility are simply challenges to the quality of the prosecution's evidence, and not to the sufficiency of the evidence," *id.* at *15, an assessment of the credibility of witnesses is therefore generally beyond the scope of federal *habeas* review of sufficiency of evidence claims. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)(on

*habeas* review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial). It is the province of the fact finder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992). A *habeas* court must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003).

Here, the jury had the opportunity to consider all of the witnesses' testimony. The jury apparently discredited the testimony of Myers's alibi witnesses, and this court will not second guess the jury's credibility determination. *See Boyles v. Sherry*, No. 2:06-cv-12207, 2008 WL 4793412, *12 (E.D. Mich. Oct. 31, 2008). The court on *habeas* review must defer to the jury's findings, made beyond a reasonable doubt, that the witness testimony and the physical evidence supported the prosecution's charges.

Given the testimony adduced at trial, the court finds that the Tennessee Court of Criminal Appeals' decision to reject the petitioner's insufficiency of evidence claim was not an unreasonable application of the law. The appellate court correct cited the applicable federal standard of review from *Jackson v. Virginia* and reasonably decided the claim against the petitioner.

Nor has the petitioner shown that the  state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Although much of the evidence against the petitioner was circumstantial in nature, the Sixth Circuit has expressly recognized that "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 824 (6th Cir. 2006)(citations omitted); *see also United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010)("[P]hysical evidence is not a prerequisite to sustaining a conviction.").

The petitioner is therefore not entitled to relief on the basis of this claim.

**B.    Jury Instructions (Claim 2)**

**1.    Exhaustion**

The respondent concedes that the petitioner has exhausted this claim.  (Docket No. 20 at p. 23).

**2.    Merits**

Myers's second claim is that he was denied his Fifth, Sixth, and Fourteenth Amendment rights because of the trial court's erroneous charge to the jury.  (Docket No. 1 at p. 6).  Myers raised this issue on direct appeal from his convictions, arguing that the trial court's jury instruction "did not require that all of the facts or elements of the crime be proved beyond a reasonable doubt."  (Docket No. 21-3).

The trial court instructed the jury, in part, as follows:

> When the evidence is made up entirely of circumstantial evidence, then before you would be justified in finding the defendant guilty, you must find that all the essential facts are consistent with the hypothesis of guilt, as that is to be compared with all the facts proved; the facts must exclude every other reasonable theory or hypothesis except that of guilt; and the facts must establish such a certainty of guilt of the defendant as to convince the mind beyond a reasonable doubt that the defendant is the one who committed the offense. It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to satisfy the jury beyond a reasonable doubt of all the facts necessary to constitute the crime charged. Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing in effect a moral certainty that the defendant, and no one else, committed the offense.

*Myers*, 2004 WL 911280, at *6.

In considering the defendant's challenge to the above jury instruction, the Tennessee Court of Criminal Appeals first noted that the Tennessee Supreme Court had upheld an identical jury instruction as a correct statement of the law in *State v. Bane,* 853 S.W.3d 483, 487-88 (Tenn. 1993). *Id.* at *7. Next, the appellate court explained that the defendant's reliance upon *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002) was misplaced because, while the two cases interpret the United States Constitution to require that each fact or element that is a condition to the imposition of a sentence above the statutory maximum must be decided by a jury beyond a reasonable doubt, the cases do not mandate that each and every discrete fact indicating guilt in a criminal prosecution be proven beyond a reasonable doubt. *Id*. Because all that is necessary is that the elements of the charged offense be proven beyond a reasonable doubt, the appellate court determined that the trial court's instruction in this regard was proper and rejected the defendant's claim. *Id.*

Myers has failed to demonstrate that the state court's adjudication of his claim was contrary to or an unreasonable application of a clearly established federal law or that it was based upon an unreasonable determination of the facts in light of the evidence. Clearly established federal law requires the state to prove enough facts to satisfy a reasonable jury beyond a reasonable doubt of all of the facts necessary to prove the elements of the crimes. The state need not prove beyond a reasonable doubt each particular fact presented in the state's case in chief. The jury instruction at issue was clear, coherent, and consistent with the governing law. Thus, Myers is not entitled to relief on this claim.

## C.     Ineffective Assistance of Counsel Claims (Claims 3-11)

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel.   To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant.  *See Bell v. Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness.  *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000).   In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690-91.   Reasonable attorneys may disagree on the appropriate strategy for defending a client.  *Bigelow v. Williams,* 367 F.3d 562, 570 (6th Cir. 2004).

The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland,* 466 U.S. at 695.   "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996)(quoting *United States v. Morrow*, 977

F.2d 222, 229 (6th Cir. 1992)(*en banc*)).  "Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  *Strickland*, 466 U.S. at 689.

### 1. Ineffective Assistance of Counsel for failing to call Jimmy Bonner, Terry Coppinger, and Dan McInnis as witnesses at trial (Claims 3, 6, 7)

#### a. Exhaustion

The respondent concedes that the petitioner has exhausted these three claims of ineffective assistance of counsel.  (Docket No. 20 at p. 25).

#### b. Merits

In claims 3, 6 and 7, the petitioner contends that he was denied effective assistance of counsel based upon trial counsel's failure to call Jimmy Bonner, Terry Coppinger, and Dan McInnis to testify on Myers's behalf at trial.  (Docket No. 1 at pp. 8, 16-17).  The post-conviction court denied the petition for relief on these grounds orally immediately following the post-conviction hearing, finding as follows:

> The failure to call witnesses is important at this stage for the petitioner to bring before the court those witnesses that would testify to what evidence was not presented to the court perhaps by the ineffectiveness of counsel or by some new evidence which may have been found, it could be possibly brought in post-conviction, but it must come before the court competently and it must come as sworn testimony and it must come so that the court can make a finding that if called at trial, the testimony would be as it is today and that it would materially affect the outcome of this particular trial.
>
> I've heard of Spangler, Humphrey, McCormick, a Diane, I don't remember the last name, and even a son named Raymond and I've not

heard from any of them. I did hear from a couple of witnesses. One on the day of the event cannot testify that the truck was at the place that would possibly help the petitioner because he went to the biscuit, breakfast biscuit that he gets a different way that day, so that particular witness is of no effect to the defendant.

And then I heard from another witness who had two interviews, I believe his name was Jimmy Bonner, and I think Mr. Bonner was being as candid as he could be with the court, but he gave two statements and the most important thing of those two statements and what would have helped the petitioner the most is that back two days after the event he would have said that he could put the defendant's truck across the street from where he lived or there in the neighborhood. And he had the other opportunity then a short while after that to do the same thing and according to his testimony, if I recall that testimony correctly, the first thime it's been brought to the attention of the state or of the defense may be today in the preparation of these proceedings. He was called and I appreciate hearing from him, but his testimony, though it is what I believe is his heartfelt understanding, is not being accepted by this court as being good testimony because it wasn't given that way at the time when it was most important.

So the failure to call witnesses is what we're looking at at this time and as we look at those things, we have an understanding from the investigators that are here and from Appman, who testified, and from the petitioner, who testified, that the defense in this case is an alibi. We know, those that are practicing law here in this state, that an alibi defense is one you live or die by. It is a great defense if it works and it is one that generally stands on its own and you put all of your eggs in one basket.

The petitioner today and through his witnesses indicates to this court that he should have been given a full defense, that there were other possibilities for defense. Mr. Appman is able to help this court to understand the thinking of the petitioner and the trial attorney at the time by helping the court to understand that he had an alibi defense, that when you present an alibi defense you present those that are the best in the alibi defense and you don't present as many witnesses as you have investigated. But you present those that are strong alibi witnesses.

* * *

But it is a good defense if it is properly brought and it's not well brought if more witnesses are put on that can be cross-examined and more witnesses by the petitioner were to be put on, it has a great possibility of going backwards and causing the petitioner to have real difficulty.

* * *

And so the failure to call witnesses because of those reasons is not compelling to this court today and has not been proven by clear and convincing evidence.

(Docket No. 21-12 at pp. 59-61). In its written order entered following the post-conviction hearing, the post-conviction court continued:

The Court finds the neither the testimony of Dan McInnis nor Coppinger, if presented at trial, would have caused a different verdict. There is no proof that had the witnesses testified as they did during the post conviction hearing, the petitioner's alibi defense would have been bolstered or effective.

The Court finds that Jimmy Bonner would not have been a credible witness during the petitioner's trial, as this post conviction Court, weighing Bonner's credibility, does not believe Bonner to be credible. Further, the petitioner has failed to show how the outcome of his trial would have been different if Bonner had testified at the petitioner's trial as he testified during this post conviction hearing.

(Docket No. 21-14 at p. 23).

Myers raised these claims of ineffective assistance of counsel on appeal from the denial of his post-conviction petition. (Docket No. 21-13). On appeal of the denial of his petition for post-conviction relief as to these claims, the Tennessee Court of Criminal Appeals held:

Next, Petitioner complains that trial counsel failed to call witnesses to support his alibi defense. Dan McInnis, Terry Coppinger, and Jimmy Bonner were called to testify at the hearing in support of Petitioner's claim. Mr. McInnis testified that he saw Petitioner near

a store on the morning of the crimes driving a little car. However, on cross-examination, Mr. McInnis was unsure of the date that he saw Petitioner and acknowledged that, at the time he saw Petitioner, there would have been ample time to commit the crimes. Mr. Coppinger testified that Petitioner's truck had been at his mother's house for several days around the time of the murders. On further examination, however, Mr. Coppinger could not definitively say that Petitioner's truck was in the neighborhood on the morning of the crimes. Lastly, Jimmy Bonner testified that he saw Petitioner's truck at Petitioner's mother's house at the time of the murders. Mr. Bonner admitted that he did not include this information in his two statements to police but claimed that he had talked to investigators about this at a later time. The post-conviction court determined that the testimony of Mr. McInnis and Mr. Coppinger, "if presented at trial, would [not] have caused a different verdict." Further, the post-conviction court determined that Mr. Bonner was not credible. Petitioner has failed to show prejudice by trial counsel's failure to call these witnesses at trial.

(Docket No. 21-15 at pp. 862-63).

Given the post-conviction court's findings as to Bonner's lack of credibility and as to Coppinger and McInnis's lack of clarity and certainty, the court finds that the state courts' determination that there was no deficient performance by trial counsel in failing to call these witnesses was a reasonable application of *Strickland*. *See United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995)(failure to present potential witnesses who are unreliable and subject to impeachment does not constitute ineffective assistance of counsel). The state courts' resolution of this claim must remain undisturbed since it was neither an unreasonable application of *Strickland* nor based on unreasonable factual determinations. Thus, Myers is not entitled to relief on this claim.

### 2. Trial Counsel's Competency (Claim 4)

#### a. Exhaustion

The respondent concedes that the petitioner has exhausted this claim. (Docket No. 20 at p.

27).

### b. Merits

Myers's fourth claim is that he was denied effective assistance of counsel based upon trial counsel's alleged mental incompetence. (Docket No. 1 at p. 10). He asserts that trial counsel was suffering from "an apparent mentally debilitating disease," which prevented counsel from preparing the petitioner's defense and "participating competently in the trial." (*Id.*)

In its oral decision denying the petitioner relief on this ground, the post-conviction judge found:

> I've read the trial transcript. I've seen the testimony of those that are here today. I have questioned even myself; I'm concerned for what was being seen on that day because I wasn't there. I am not, [i]n any way, considering my knowledge of Attorney Appman and what he may have been like at that time. I saw how he testified today; he made good sense to me. He is an attorney that has practiced much longer than some of us in the courtroom had been alive [.] And he, I believe, was effective in this case.

> The proof before the jury in this case, which was a circumstantial case, was strong. It was a very difficult case for the defendant. The defendant chose to defend on the defenses that this court has outlined and have been outlined by Defense Attorney Appman. And in the reading of the transcript and in the presentation that has come today, I'm not swayed by what a Doctor of Sociology or Social Medicines or what an investigator or what the investigator's assistant that may have ridden in the car that saw the shape of the vehicle. I would probably not have got in the vehicle if was Ms. Neca [S]hepard. But I'm not surprised that an attorney's car might look a little disheveled.

> What I'm saying is on the day that this case was tried and at the time that this case was being prepared, this court is not persuaded by clear and convincing evidence that Mr. Appman was under any burden of any incompetency. There is nothing before this court to show that he was anything other than an effective trial counsel at the time, through the reading of the transcript as I've said. And there is no clear and convincing evidence before this court, though Ms. Brady indicates

that the testimony of these trained professionals should give the court some pause, I've heard it, I've weighed it, and in weighing it against the standard of clear and convincing evidence, it's lacking. And so I find that that particular allegation fail[s].

(Docket No. 21-12 at pp. 800-01).

In its written order denying relief, the post-conviction court summarized:

The Court finds that there is insufficient proof to show that trial attorney Appman was incompetent. There was no testimony from the petitioner or his witnesses of specific incidents to cause this Court to question Attorney Appman's competence in this case. The Court's review of the trial transcript and of the evidence presented during this post conviction hearing do not prove that there was a failure on Appman's part to prepare or investigate, a failure to call essential witnesses, nor a failure to present appropriate defenses.

(Docket No. 21-10 at p. 605). The post-conviction court further found that the petitioner had not carried the burden of demonstrating prejudice as a result of any alleged ineffectiveness by trial counsel. (*Id.* at pp. 605-06).

Myers raised this claim of ineffective assistance of counsel on appeal from the denial of his post-conviction petition. (Docket No. 21-13). Identifying *Strickland* as the source of the governing legal standard, the Tennessee Court of Criminal Appeal determined that the evidence preponderated against the petitioner's claim, finding:

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "'the range of competence demanded of attorneys in criminal cases.'" *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of

33

the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "'Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim.'" *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "'determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo'" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

* * * *

Lastly, Petitioner insists that trial counsel was incompetent because he was "'forgetful and confused.'" The post-conviction court found that trial counsel had no health problems at the time of Petitioner's trial. Specifically that "'[t]here was no testimony from [Petitioner] or his witnesses of specific incidents to cause this Court to question [trial counsel's] competence in this case.'" We agree. The evidence does not preponderate against the findings of the post-conviction court. Petitioner is not entitled to relief on this issue.

(Docket No. 21-15 at pp. 862-63).

The record supports the post conviction courts' findings. Trial counsel Appman testified that during the pendency of the petitioner's case he did not have any health problems. (Docket No.

21-11 at p. 704). At the time of the trial, he had been practicing law for thirty-eight (38) years. (*Id.* at p. 696). He invested many hours working on the petitioner's case. (*Id.* at p. 703, Exh. 1). He testified that he did everything in his power in this case in an attempt to secure a not-guilty verdict for his client and that he was still at a loss as to how the jury could have found the petitioner guilty. (*Id.* at p. 707).

Although Neca Shepard, Dr. Charles Frost, Tom Burland, and Tom Isbell testified during the post-conviction hearing that they had concerns about Appman's competence during the trial and that they found him forgetful and confused, none of these witnesses was a licensed attorney. Isbell acknowledged that Appman was very involved in the case, that he focused on an alibi defense, and that he stayed with the alibi defense. (Docket No. 21-12 at p. 758). Isbell also acknowledged that he did not know the rules of evidence and did not know what evidence would be admissible at trial. (*Id.*) Although he claimed that he had been concerned about Appman's performance, Isbell never contacted the trial judge about his concerns. (*Id.* at p. 762). Isbell conceded that the fact that Appman did not put a witness on the stand did not necessarily mean that he did not use the information that Isbell gathered for him. (*Id.* at p. 766-772). The petitioner's case was Isbell's first capital case. (*Id.* at p. 756).

Likewise, Frost admitted that this was the first capital case of his career. (Docket No. 21-11 at p. 672). He acknowledged that trial counsel was able to put together a solid alibi defense. (*Id.* at p. 677). He, like Isbell, admitted that he had never expressed any concern about trial counsel's ability to the court. (*Id.*) Shepard recalled only two instances in which she interacted with trial counsel, and she could not explain to the court what evidence she believed trial counsel should have used at trial but did not. (*Id.* at p. 679). She, too, admitted that the petitioner's trial was the first

35

capital case of her career. (*Id.* at p. 683). Private investigator Borlund also had never worked on another capital case. (*Id.* at p. 729).

It was not unreasonable for the state courts to conclude, based on the evidence, that trial counsel had not suffered from competency issues during the petitioner's trial. Because the petitioner has failed to demonstrate that the state court's adjudication of his claims involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court, he is not entitled to habeas relief on this claim.

### 3. Trial Counsel's Failure to Prepare and Investigate (Claim 5)

### a. Exhaustion

The respondent failed to address the petitioner's fifth claim (ineffective assistance of trial counsel due to failure to prepare and investigate the petitioner's case) in its answer to the petition for writ of *habeas corpus*. (Docket No. 20).[5]

Myers raised this claim in his post-conviction petition (Docket No. 21-10 at p. 600) and again on appeal of the denial of his post-conviction petition to the Tennessee Court of Criminal Appeals. (Docket No. 21-15 at p. 862). The court finds that the petitioner has exhausted this claim insofar as it is presented as a general claim of ineffective assistance of trial counsel based on a broad failure to prepare and investigate the case (Claim 5), as opposed to the petitioner's more specific claims of ineffective assistance of trial counsel based on his failure to call certain witnesses to testify on the petitioner's behalf (Claims 8-11).

---

[5] The respondent may have intended for his responses to Claims 8-20 to address this claim, and the court acknowledges that there is some overlap.

### b.    Merits

In its written order denying relief as to this claim, the post conviction court found that:

> The Court's review of the trial transcript and of the evidence presented during this post conviction hearing do not prove that there was a failure on Appman's part to prepare or investigate, a failure to call essential witnesses, nor a failure to present appropriate defenses.
>
> To maintain a claim of denial of effective assistance of counsel, it is incumbent upon the petitioner to show by clear and convincing evidence that trial counsel was ineffective, or that trial counsel's performance was not within the range of competence demanded in criminal cases, or that a reasonable probability exists that but for any error by counsel, the jury would have a reasonable doubt as to the petitioner's guilt. The petitioner must demonstrate that the deficient performance of counsel caused prejudice. In order to demonstrate prejudice, the petitioner must show that there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. The petitioner has not carried this burden.

(Docket No. 21-10 at pp. 605-06).

On appeal of the denial of his petition for post conviction relief, the petitioner again raised the issue of whether counsel was ineffective by failing to adequately prepare and investigate. (Docket No. 21-13 at p. 815). In affirming the post-conviction court's denial of the petition for post-conviction relief, the appellate court found:

> Petitioner complains that trial counsel failed to adequately prepare and investigate Petitioner's case by failing to utilize "the information that his private investigator uncovered." The post-conviction court noted that this was a "complex" case but determined that "the investigation was thorough and complete at the time of trial." The testimony at the post-conviction hearing indicated that trial counsel had at least five bankers boxes full of documents related to the investigation of Petitioner's case and that the team of investigators had identified nearly 400 potential witnesses. Petitioner has failed to show that he was prejudiced by trial counsel's failure to prepare for the case. Petitioner is not entitled to relief on this issue.

(Docket No. 21-15 at p. 862).

Even assuming *arguendo* that Myers established that trial counsel's preparation and investigation was constitutionally deficient, the state courts' conclusion that Myers had not demonstrated prejudice as a result of the failure of counsel was not an unreasonable application of clearly established federal law, nor was it based upon an unreasonable application of the facts in light of the evidence before the state court. As the court noted earlier (*see supra* at p. 24), the circumstantial evidence in this case supported the petitioner's conviction beyond a reasonable doubt. Trial counsel had at least five banker's boxes full of documents related to the investigation of the petitioner's case and the team of investigators working for the defense had identified nearly 400 potential witnesses. Yet, the defendant's alibi witnesses were discredited by the jury. The petitioner has never established how he was prejudiced by trial counsel's alleged failure to investigate or prepare for his case. Consequently, the petitioner is not entitled to habeas relief on this claim.

## 4. Trial Counsel's Failure to Call or to Properly Cross Examine Witnesses Robert Spangler, Shirley Humphrey, Shawn McCormick, and Raymond Hicks Myers (Claims 8-11)

In Claims 8-11 of his petition, Myers claims that trial counsel rendered ineffective assistance of counsel by failing to call as a witness and/or by failing to properly cross examine Robert Spangler (Claim 8), Shirley Humphrey (Claim 9), Shawn McCormick (Claim 10), and petitioner's son Raymond Hicks Myers (Claim 11). (Docket No. 1 at pp. 17-18).

In initially responding to Myers's petition, the respondent argued that Myers had procedurally defaulted these claims. (Docket No. 20). After the petitioner filed a supplemental brief (Docket No. 45) addressing the procedural default of these claims under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012)*,* and *Maples v. Thomas*, 132 S. Ct. 912 (2012), the court ordered the respondent to file a

response to the petitioner's brief. (Docket No. 55).

In his response, the respondent maintains that the petitioner's procedurally defaulted ineffective assistance claims are excluded from the purview of *Martinez* because the petitioner raised those claims during initial-review collateral proceedings and *Martinez* does not extend to ineffective-trial-counsel claims that were included in the post-conviction pleadings, raised during the post-conviction hearing, and denied by the post-conviction court. (Docket No. 60 at pp. 5, 7).

Arguably, the petitioner raised his claims that trial counsel rendered ineffective assistance of counsel by failing to call as a witness and/or by failing to properly cross examine Robert Spangler (Claim 8)[6], Shirley Humphrey (Claim 9), petitioner's son Raymond Hicks Myers (Claim 11)[7], and Shane McCormick (Claim 10)[8] either in his *pro se* original or amended post-conviction petition

---

[6] The petitioner asserted in his original *pro se* post-conviction petition that trial counsel failed to reveal any and all agreements between Spangler and the state in exchange for his testimony against the petitioner. (Docket No. 21-8 at p. 293). The petitioner further asserted that trial counsel failed to elicit any information on cross examination regarding the fact that Spangler has been investigated, arrested, convicted, and sentencing for drug manufacturing. (*Id.*) During the post-conviction hearing, the petitioner's counsel specifically challenged trial counsel's alleged failures with regard to Spangler. (Docket No. 21-12 at pp. 745-46, 772). The post-conviction court found no evidence of a failure on trial counsel's part "to prepare or investigate," "to call essential witnesses," or "to present appropriate defenses." (Docket No. 21-14). This issue was not raised by the petitioner on appeal but was raised in his application for permission to appeal to the Tennessee Supreme Court.

[7] The *pro se* post-conviction petition broadly challenged trial counsel's failure to call or to properly cross examine these witnesses. (Docket No. 21-8). In its order denying the petition, the post-conviction court specifically referenced the petitioner's allegations that trial counsel had failed to prepare and properly investigate, failed to call essential witnesses, and failed to present all defenses and found that the petitioner had not carried his burden of demonstrating constitutionally deficient performance by counsel and prejudice to the defendant. (Docket No. 21-10 at p. 61). These issues were not raised by the petitioner on appeal but were raised in his application for permission to appeal to the Tennessee Supreme Court.

[8] The petitioner raised this claim in his original *pro se* petition for post-conviction relief. Specifically, Myers argued that trial counsel failed to reveal any and all agreements between McCormick and the state in exchange for his testimony. (Docket No. 21-8 at p. 292). The petitioner further argued that trial counsel failed to elicit any information on cross examination regarding the fact that McCormick had a grand theft charge that either had not been pursued or had been dropped. (*Id.*) Post-conviction counsel raised the claim during the petitioner's post-conviction hearing. (Docket No. 21-12 at pp. 747, 752-54, 774). After considering these challenges to counsel's preparation, the post-conviction court denied relief. (Docket No. 21-10). This issue was not raised by the petitioner on appeal, but was raised in his application for permission to appeal to the Tennessee Supreme Court.

specifically or generally, or through counsel during the post-conviction hearing. The post-conviction court rejected the claims. However, on appeal of the denial of the post-conviction petition, none of these claims were raised. Thus, the claims are considered to be exhausted (because no further state review is available) but procedurally defaulted (because they were never presented to the state appellate court), and may not be considered by the federal court on habeas review unless Myers demonstrates both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors. *See Keeney v. Tamayo–Reyes*, 504 U.S. 1, 8, 112 S. Ct. 1715, 118 L.Ed.2d 318 (1992) (failure to develop facts in state court constitutes procedural default, subject to *Coleman's* cause-and-prejudice standard), *superceded in other part by statute,* 28 U.S.C. 2254(e)(2) (1996).

The respondent asserts that these claims are procedurally defaulted because, although they may have been raised in the trial level post-conviction court, they were not raised in the subsequent appeal. Again, the petitioner does not dispute that the claims were procedurally defaulted on post-conviction appeal, but he asserts, *inter alia*, that ineffective assistance of post-conviction appellate counsel is cause to excuse his defaults.

It is well settled, however, that the ineffective assistance of counsel during post-conviction appeal does not constitute cause to overcome procedural default. *Coleman*, 501 U.S. 722, 742-53 (1991); *Martinez*, 132 S. Ct. at 1320. Specifically, the *Martinez* exception does not apply to claims that were raised at the post-conviction initial-review proceeding but not preserved on post-conviction appeal. *West v. Carpenter*, 790 F.3d 693, 698-99 (6th Cir. 2015)(holding that "attorney error at state post-conviction appellate proceedings cannot excuse procedural default under the *Martinez-Trevino* framework."). This is because a petitioner whose claims were heard on the merits on post-conviction initial review has received the opportunity *Martinez* was fashioned to guarantee: to

ensure that "the claim will have been addressed by one court, whether it be the trial court, the appellate court on direct review, or the trial court in an initial review collateral proceeding." *Martinez*, 132 S. Ct. at 1316.[9] Accordingly, ineffective assistance of post-conviction appellate counsel does not qualify as cause to excuse claims defaulted at that stage of proceedings. *See also Young v. Colson*, No. 3:12-CV-00304, 2015 WL 9581768, at *11 (M.D. Tenn. Dec. 30, 2015)(Trauger, J.).

The Supreme Court has observed, however, that there is an "essential difference between a claim of attorney error, however egregious, and a claim that an attorney had essentially abandoned his client." *Maples v. Thomas*, 132 S. Ct. 912, 923 (2012). In *Maples*, the Supreme Court held that where a petitioner's post-conviction attorney ceased representing him in the midst of post-conviction proceedings without filing a notice to that effect or informing the defendant in any way, counsel's abandonment of the petitioner may provide cause to excuse the procedural default of his claims for relief in his habeas petition. *Id.* at 916-17. The Court explained that a prisoner typically bears the consequences of his attorney's conduct, even negligent conduct, under principles of agency law but that cause to excuse a procedural default "exists where something external to the petitioner,

---

[9] The court acknowledges the petitioner's argument that, although he was technically represented by two different attorneys in his initial review collateral proceeding, he did not enjoy the effective assistance of post-conviction counsel at that time (prior to the appeal of the denial of his post-conviction petition) because the petitioner filed his post-conviction petition *pro se*; filed an amended post-conviction petition *pro se* after appointed attorney Craig Fickling failed to file an amended petition over a three and a half year period, despite petitioner's diligent efforts to persuade him otherwise, and after the petitioner asked the court to remove Fickling as his attorney; and, over the petitioner's objections, attorney Rebecca Brady filed a notice that she would not submit an amended petition on Myers's behalf, allowing his case to be presented to the post-conviction court solely on legal documents prepared by the petitioner himself. (*See* Docket No. 63). In other words, the petitioner posits that he did not receive the benefit that *Martinez* sought to protect: effective representation by post-conviction counsel to secure review of substantial claims of ineffective assistance of counsel raised in his initial review collateral proceeding.

The court further acknowledges the petitioner's argument that, under the facts of this case, *Martinez* should be extended to excuse the procedural default resulting from attorney Brady's failure to raise Claims 8-11 on appeal of the denial of post-conviction relief.

something that cannot fairly be attributed to him, . . . impeded [his] efforts to comply with the State's procedural rule." *Id.* at 922 (emphasis and alterations in original) (internal quotation marks omitted) (citing *Coleman*, 501 U.S. at 753). Accordingly, an attorney's abandonment of his or her client without notice that then causes procedural default can establish cause to excuse the procedural default. *Id*. at 922-23.

Here, the petitioner asserts that the ineffective assistance of post-conviction attorneys Fickling and Brady amounted to effective abandonment and constitutes cause to overcome the procedural default of his claims under *Maples*. (Docket No. 45 at p. 13). Specifically, the petitioner alleges that (1) his first appointed post-conviction attorney, Fickling, failed to amend Myers's *pro se* post-conviction petition after three and a half years of representation, despite a state rule that appointed counsel must file an amended petition within thirty days; (2) Myers asked the state court to remove Fickling, a request that the court promptly granted, appointing attorney Brady; (3) once appointed, Brady not only failed to amend Myers's post-conviction petition but also failed to obtain the proper confirmation from Myers that he agreed no additional pleadings need to be filed, thereby resting on the claims presented by the petitioner himself in his *pro se* pleadings; and (4) on appeal of the denial of Myers's post-conviction petition, Brady raised only one issue, thereby procedurally defaulting many of the petitioner's claims.

Negligence of counsel does not equate to abandonment under *Maples.* 132 S.Ct. at 922; *see also Bell v. Howes*, No. 2:06-cv-15086, 2014 WL 255886, at *6 (E.D. Mich. Jan. 23, 2014)("Counsel's failure to raise a particular claim, even a meritorious one, does not present the 'veritable perfect storm of misfortune' visited upon the petitioner in *Maples* . . . ." )(quoting *Martinez*, 132 S. Ct. at 929). The question before this court, then, is whether the performance of

Fickling and/or Brady as described by the petitioner and supported by the record constitutes mere negligence under *Maples* or "abandonment" mirroring the "veritable perfect storm of misfortune" visited upon Maples.

The petitioner here never alleges that either Fickling or Brady ceased representing him without notification. Unlike the attorneys in *Maples*, Fickling never changed law firms or cut off all communication with Myers. Fickling corresponded with Myers, but not to Myers's satisfaction. (Docket No. 21-10 at pp. 551-54). Myers participated directly in the preparation of his case, as demonstrated by his approximately 144-page petition for post-conviction relief and accompanying memorandum (Docket No. 21-8 at pp. 282-425), his motion to dismiss his first post-conviction counsel, (Docket No. 21-10 at pp. 548-85), and his *pro se* application to appeal to the Tennessee Supreme Court (Docket No. 21-16). Brady represented Myers at his post-conviction hearing.

The petitioner argues, however, that "[t]he fact that Respondent communicated with his attorneys in an attempt to convince them to represent him as they were required to, and that he filed voluminous pro se pleadings after these communications were unsuccessful, are strong evidence of the fact that his attorneys failed to represent him." (Docket No. 53 at pp. 3 and 4). But, unlike Maples who believed that his lawyers were vigilantly representing him but were not, Myers here knew that his attorneys of record were not performing as we wished. Maples "lacked a clue of any need to protect himself *pro se*," while Myers had a clue and in fact protected himself by filing two amended petitions for post-conviction relief *pro se* and successfully discharging Fickling. Myers was not "blocked from complying" with any procedural rule by any factors external to him, but instead had the opportunity to "fend for himself" and did.

Another district court in this circuit has found that the failure to file a brief after receiving

several extensions of time does not establish cause under *Maples*, because it is "more akin to neglect, however egregious, than to abandonment." *Stojetz v. Ishee*, No. 2:04-cv-263, 2014 WL 4775209, at *114 (S.D. Ohio Sept. 24, 2014). District courts in other circuits have reached the same conclusion on similar facts. *E.g., Hurley v. Cassady*, No. 14-3094-CV-S-MDH-P, 2014 WL 4185510, at *7 (W.D. Mo. Aug. 21, 2014) (failure to include four colorable claims on post-conviction appeal was not abandonment, but ineffective assistance that could not constitute cause); *United States v. Soto-Valdez*, No. CV-99-1591-PHX-RCB (LOA), 2013 WL 5297142, at *23–24 (D. Ariz. Sept. 19, 2013) (filing a deficient brief after receiving multiple extensions of time was negligence, not abandonment). Failure to raise colorable claims, even when combined with lack of communication with the petitioner, has been characterized as "a claim of serious negligence, but it is not 'abandonment.' " *Ngabirano v. Wengler*, No. 1:11-cv-00450-BLW, 2014 WL 517494, at *5 (D. Idaho Feb. 7, 2014) (quoting *Moorman v. Schriro*, 672 F.3d 644, 648 (9th Cir. 2012)).

Even if Fickling and/or Brady's conduct was negligent, or even seriously negligent, the petitioner has not shown that he was abandoned by Fickling or Brady in the same way Maples was abandoned by his counsel. Because the petitioner was not abandoned by post-conviction counsel as was the "extraordinary" case of Maples, *Maples* may not serve as cause to excuse the procedural default of the petitioner's claims. Further, because *Martinez* does not reach claims defaulted on post-conviction appeal, Claims 8-11 must be dismissed on the basis of procedural default.

### D. State's Alleged Suppression of Exculpatory Evidence (Claims 12-20)

In Claims 12-20 of his petition, Myers claims that the state allegedly suppressed various pieces of exculpatory evidence in violation of his constitutional rights. (Docket No. 1 at pp. 18-22; Docket No. 3 at pp. 95-100). The respondent argues that claims 12-20 are procedurally defaulted

and that *Martinez* does not provide a basis to excuse the default because *Martinez* applies only to defaulted claims of ineffective assistance of trial counsel. (Docket No. 60 at pp. 7-8).

Myers raised Claims 12-17 and 20 in his initial state post-conviction petition. (Docket No. 21-8 at p. 293; Docket No. 21-9 at pp. 461-62, 478-79, 541-41; Docket No. 21-10 at pp. 598-606). However, he did not present any of those same claims to any state appellate court thereafter and is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising them at this time. Tenn. Code Ann. § 40-30-102(a)(c) and -117; *see also* Tenn. R. App. P. 36(a).

As to Claims 18 and 19, Myers did not raise these claims in his petition for post-conviction relief and has never presented the claims to any state court. He is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising them at this time.

Because the petitioner has never fully and fairly presented Claims 12-20 to the state courts, and a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53.

*Martinez,* however, does not provide a basis to excuse the procedural default of claims 12-20 because *Martinez* applies only to defaulted claims of ineffective assistance of trial counsel. *Martinez*, 132 S. Ct. at 1319 (stating that the rule of *Coleman* continues to govern "except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at trial."). The *Martinez* exception does not apply to defaulted *Brady*[10] claims. *Abdur'Rahman v. Carpenter*, 2015 WL 6719715, at *4 (6th Cir. Nov. 4, 2015)("Even if we were to . . . analyze Abdur'Rahman's

_____

[10] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963).

underlying claims of Brady violations and prosecutorial misconduct, *Martinez* would not apply to those claims . . . ."); *Hamm v. Comm'r, Ala. Dep't Corr.*, No. 13-14376, 2015 WL 4605112, at *28 (11th Cir. Aug. 3, 2015) (stating that "*Martinez* applies to defaulted ineffective-assistance-of-trial-counsel claims only and not, for example, to *Brady* claims"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126-27 (9th Cir. 1013) (holding that *Martinez* does not apply to a procedurally defaulted *Brady* claim).

The petitioner goes further, asking this court to find that the equitable rule established in *Martinez* applies in a case where a petitioner, acting *pro se* during his initial review collateral proceedings in state court, failed to raise and thereby procedurally defaulted his *Brady* claims. The petitioner is not alone in advancing this argument. *See Hunton v. Sinclar,* 732 F.3d 1124, 1128 (9th Circuit 2013)(Fletcher, J., dissenting)(finding that the reasoning behind *Martinez* "applies with equal force to a defaulted *Brady* claim" and that "[n]othing in what the Court wrote differentiates a trial-counsel IAC claim from the *Brady* claim at issue . . . ."). But, this court is constrained by precedent,"leaving to [the Court] the prerogative of overruling its down decisions."[11] *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

Because *Martinez* does not excuse the petitioner's procedural default of Claims 12-20, these claims must be dismissed on the basis of procedural default.

### E. Claim 21: Actual Innocence

Myers's final claim for relief is that he is actually innocent of the murders of Dianne Watts,

---

[11] Justice Scalia, dissenting in *Martinez*, anticipated cases in which petitioners, like Myers here, argue for an extension of *Martinez* to *Brady* claims. Justice Scalia wrote that "[t]here is not a dime's worth of difference in principle" between trial-counsel ineffective of counsel claims and *Brady* claims that have been procedurally defaulted by initial collateral review counsel. *Martinez*, 132 S. Ct. at 1321 (Scalia, J., dissenting).

Jessica Watts, and Chelsea Smith. (Docket No. 1 at pp. 22-24). He alleges that newly discovered evidence proves his innocence, including: (1) testimony of an unidentified witness who "has come forth and informed members of the Myers family that several individuals who participated with John Lewis and/or perpetrated the crimes herein came by the home of said witness to change clothing and take showers . . . . The individuals who are alleged to have come by are said to be Toby Young, Steven Alley, and Tim Meirs"; (2) testimony of witness Brandy Hodge's brother that his sister was lying about hearing the petitioner's truck on the night of the murders; (3) testimony of Donnie Jones that Toby Young confessed to having been present in the house when the crimes were committed and never stated that the petitioner was involved; (4) testimony of Mark Petty that Toby Young had witnessed the murders and had not identified the petitioner as one of the individuals involved; and (5) letters and information from Shirley Humphreys reflecting that Toby Young, Tim Meirs, Mike Brady, and others had committed the murders. (Docket No. 1 at pp. 23-24).

To the extent that Myers attempts to make a claim of actual innocence based on this alleged "newly discovered evidence," a claim of actual innocence is not itself a constitutional claim but instead a gateway through which a *habeas* petitioner must pass to have his otherwise barred constitutional claim considered on the merits. *Herrera v. Collins*, 506 U.S. 390, 404, 113 S. Ct. 853, 122 L.Ed.2d 203 (1993). The actual innocence exception is very narrow in scope and requires proof of factual innocence, not just legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 828 (1998). In this case, the petitioner is asserting a freestanding actual innocence claim, that is, a claim of actual innocence that is not used to excuse the procedural default of another claim. Although the Supreme Court has suggested that it may recognize freestanding actual innocence claims in capital cases, *see Herrera*, 506 U.S. at 417, it has not done so in

noncapital cases such as this one. Thus, on its face, Myers's contention fails to state a claim upon which habeas relief can be granted as the Supreme Court has never ruled that a freestanding actual innocence claim is cognizable in a non-capital case.

Moreover, the actual innocence exception is only applied in the most extraordinary of cases, as the Sixth Circuit has explained:

> [I]f a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup v. Delo*, 513 U.S. 298, 316, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)." Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S .Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.' " *Id.* at 321.

*Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005). The petitioner has presented no new credible evidence to suggest that he is actually innocent of the murders of Dianne Watts, Jessica Watts, and Chelsea Smith. Thus, Myers is not entitled to relief on this claim.

The respondent contends that, even if a freestanding claim of actual innocence were a cognizable ground for relief, the claim would be barred by procedural default because Myers has never properly raised it in the state courts, and state procedural rules prevent him from raising it now.

(Docket No. 20 at p. 33).

In Tennessee, claims of actual innocence not based on scientific evidence may be brought in a petition for writ of error coram nobis, within one year after the judgment of conviction in the trial court becomes final, *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999), or later if the petitioner shows that due process precludes application of the statute of limitations, *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001). In this case, Myers has never raised his actual innocence claim in a petition for writ of error coram nobis in state court under Tenn. Code Ann. § 40-26-105, and the claim is now barred from presentation to the state courts by the one-year statute of limitations. *See* Tenn. Code Ann. § 27-7-103. As such, the claim would be barred by procedural default.

In summary, for the reasons explained above, all of the petitioner's claims are either procedurally defaulted or fail on the merits.

## IV. CERTIFICATE OF APPEALABILITY

The court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R.App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing...." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that " 'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further.' " *Miller–El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L.Ed.2d 931 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484, 120

S. Ct. 1595, 146 L.Ed.2d 542 (2000)). "[A] COA does not require a showing that the appeal will succeed." *Miller–El*, 537 U.S. at 337. Courts should not issue a COA as a matter of course. *Id.*

In this case, only seven (7) of the petitioner's twenty-one (21) claims were fully exhausted and therefore reviewable on the merits. The petitioner failed to show any error of constitutional dimension in the state court's resolution of those claims, however. The other fourteen (14) claims are procedurally defaulted, and the petitioner is unable to establish the cause and prejudice necessary to overcome the procedural default.

However, the court finds that reasonable jurists could debate as to the petitioner's claim that he was effectively abandoned by his post-conviction attorneys in order to establish cause under *Maples* for his procedurally defaulted claims. The court therefore grants a certificate of appealability on that question. The court also finds that reasonable jurists could debate as to whether *Martinez* should be interpreted to apply to the facts of the petitioner's case as it pertains to Claims 8-20.[12] The court therefore grants a certificate of appealability on those questions. The court denies a COA on the rest of the petitioner's claims, but he may, however, seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

## V. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that the petition be **DENIED**, Rule 4, Rules - - - § 2254 Cases, and that the petitioner's claims be **DISMISSED** with prejudice. The undersigned further **RECOMMENDS** that a certificate of appealability issue only as to the questions of whether Myers was effectively abandoned by his post-conviction attorneys in

---

[12] Of course, even if *Martinez* and/or *Maples* apply, the petitioner would have only excused the procedural default of his claims. He would still need to demonstrate prejudice before the court could consider the merits of those claims.

order to establish cause under *Maples* for his procedurally defaulted claims and as to whether *Martinez* should be interpreted to apply to the facts of the petitioner's case as it pertains to Claims 8-20.

The parties have ten (10) days of being served with a copy of this Report and Recommendation, to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this Report and Recommendation within ten (10) days after being served with a copy thereof. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

_____
E. Clifton Knowles
United States Magistrate Judge